UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| PATRICK CLOUTIER,<br>    Plaintiff,<br><br>    v.<br><br>DYANN BAKER, in her official<br>capacity as Finance Director of the<br>TOWN OF WESTERLY; THE TOWN<br>OF WESTERLY, MICHAEL HOBIN,<br>individually and in his official capacity<br>as Principal of Westerly High School;<br>DONNA SWEET, individually and in<br>her official capacity as Assistant<br>Principal of Westerly High School; and<br>KEVIN CRONIN, individually and in<br>his official capacity as Assistant<br>Principal of Westerly High School,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 1:22-cv-00427-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

Plaintiff Patrick Cloutier sued Defendants Dyann Baker, Micheal Hobin, Donna Sweet, Kevin Cronin, and the Town of Westerly, alleging that they violated his rights to freedom of speech and association under the United States Constitution's First Amendment and Article 1, § 21 of the Rhode Island Constitution.[1] The Defendants have moved for summary judgment. ECF No. 37.

---

[1] Article 1, § 21 of the Rhode Island Constitution affords protections that are coextensive with the protections that the First Amendment of the United State Constitution affords. *See Town of Barrington v. Blake*, 568 A.2d 1015, 1018 (R.I. 1990) (citation omitted) ("Although we acknowledge that state courts may interpret

## I.    BACKGROUND

Mr. Cloutier began working as a per diem substitute teacher for Westerly Public Schools ("WPS") in late 2019.  ECF No. 38 ¶ 1.  In November 2021, WPS hired Mr. Cloutier as an Extended School Day Detention Monitor.  *Id.* ¶¶ 9,11.  Thereafter, Mr. Cloutier served as a detention monitor and substitute teacher for twelve school days at Westerly High School ("WHS") before he was terminated.  *Id.* ¶¶ 16-17. During that short period, WHS Dean of Students Megan Herlihy, reported her concerns about Mr. Cloutier's performance deficiencies to Principal Michael Hobin and Assistant Principals ("APs") Donna Sweet and Kevin Cronin.  *Id.* ¶¶ 23, 53-54, 63-64, 66, 68-69.  Around the time of Mr. Cloutier's termination, Dean Herlihy listed the performance problems on a scrap paper she gave to Principal Hobin.  *Id.* ¶ 70

On Dean Herlihy's scrap paper list was a notation, "Chose to Include Day Advisory." *Id.* ¶ 71.  That notation referred to an incident that occurred after a school event called "Choose to Include." *Id.* ¶ 72.  The event was purportedly aimed at celebrating the inclusion of students with disabilities, though Mr. Cloutier perceived the event as advocating, in part, for the inclusion of students in the LGBTQ+ community. *Id.* ¶¶ 26-29, 57.  For the event, students were required to wear a t-shirt with the printed statement "I Choose to Include." *Id.* ¶ 28; ECF No 42 ¶ 226.  When students returned to the classroom after the event, one student ("Student 2") stood

---

a state constitution to be more protective of individual rights than the Federal Constitution, we do not believe that Rhode Island's 1986 constitution affords more extensive protection to the picketers than the United States Constitution presently affords.").  Accordingly, the Court will rely on the authority of the U.S. Supreme Court to guide its resolution of the free speech issues presented here.

up, and ripped his "I Choose to Include" t-shirt, while stating "I choose not to include." ECF No. 38 ¶¶ 28, 38, 132-133. In response to the t-shirt ripping, Mr. Cloutier told Student 2 not to become disruptive but did not take any further steps to address the student's behavior. ECF No. 42 ¶ 182. While Mr. Cloutier did not notice that any student was upset from Student 2's behavior, one student present ("Student 1") reported the incident to WHS special educator Lydia Ezerins—stating that the incident "made [them] feel very uncomfortable and unsafe." ECF No. 38 ¶ 48. Student 1 also reported the incident to social worker, Colleen Roche, who collaborated with Ms. Ezerins to develop a plan to have Student 1 go into Ms. Ezerins' classroom during that class block if they were uncomfortable. *Id.* ¶ 46.

The next day, Ms. Ezerins asked Mr. Cloutier to write a disciplinary referral for Student 2 because of Student 1's report. *Id.* ¶¶ 47-48. But Mr. Cloutier declined to write the discipline referral based on his belief that Student 2's actions represented an objection to being pressured to make friends with LBGTQ+ people and thus was constitutionally protected speech. ECF No. 42 ¶ 185; ECF No. 38 ¶ 59. Ms. Ezerins later reported Mr. Cloutier's inaction to Dean Herlihy, who found the inaction "concerning" and forwarded the report to APs Sweet and Cronin. ECF No. 38-1 at 11-12 ¶¶ 11-12. Ms. Ezerins also reported Mr. Cloutier's inaction to Principal Hobin. ECF No. 38 ¶ 63. Principal Hobin and APs Sweet and Cronin believed that Mr. Cloutier's response to the incident did not align with WPS' policies, norms, and expectations—especially the policy proscribing bullying. *Id.* ¶ 64.

Also on Dean Herlihy's scrap paper list regarding Mr. Cloutier's performance were notes indicating that students under his supervision were "writing on [the] wall," "coming [and] going," making "threats" and creating "chaos" during detention. *Id.* ¶ 71. As a detention monitor, Mr. Cloutier experienced significant difficulties dealing with students who were disruptive and threatening. ECF No. 42-1 ¶ 10. As instructed, he contacted the office, either via phone or email, when faced with such students. *Id.* ¶ 11. In one email, Mr. Cloutier recommended to Dean Herlihy that WPS establish a separate detention session for students "prone to acting out" to prevent more cooperative students from being "severely disrupted by 1 or 2 non-conformist." ECF No. 38-1 at 13 ¶ 17. Dean Herlihy perceived Mr. Cloutier's suggestion as illustrating his inability to oversee and support students in detention. *Id.* at 13-14 ¶ 20. In another email, Mr. Cloutier sent Dean Herlihy a picture of a wall a student defaced during detention, which she forwarded to Principal Hobin and APs Sweet and Cronin, saying "FYI . . . please see below . . . I don't' know if Patrick [Cloutier] is a good fit." *Id.* at 15 ¶ 25.

The administration's concerns about Mr. Cloutier's performance issues culminated on his final day, during which he co-taught a reading class with multilingual language learner ("MLL") teacher Robert Guglielmo.[2] ECF No. 38 ¶ 74. In the middle of a teaching period, Mr. Guglielmo ushered his MLL students out the reading classroom and into the school library before going to AP Sweet's office to

---

[2] This reading class consisted of Mr. Guglielmo's MLL students, in addition to four or five non-MLL students who were taught by the reading teacher that Mr. Cloutier was substituting. ECF No. 38 F ¶¶ 77-78, 82.

report his list of concerns he had with Mr. Cloutier.  ECF No. 38 ¶¶ 98-99, 101, 102. Most significantly, Mr. Guglielmo reported that Mr. Cloutier was making "false and frightening statements" about Dr. Anthony Fauci[3], the COVID-19 vaccine, and the January 6, 2021 Capitol attack ("January 6th") in front of his students.  *Id.* ¶¶ 97, 99-102, 104-109.

The discussion surrounding these statements began during lunch break, when Mr. Cloutier joined Mr. Guglielmo in his classroom—where one of Mr. Guglielmo's MLL students was also present.  *Id.* ¶¶ 84-86.  Per Mr. Guglielmo's report to AP Sweet, Mr. Cloutier stated that he was in Washington D.C. on January 6th and expressed that the event was more peaceful than media reports indicated.  *Id.* ¶ 88. Then, the topic shifted to the COVID-19 vaccine—after Mr. Cloutier asked if Mr. Guglielmo had seen the article links that he sent to his WPS email.  *Id.* ¶ 91.  Mr. Guglielmo informed AP Sweet that the article links were about Dr. Fauci and COVID-19 vaccines killing people, which he "did not want to read" and "were not welcome." *Id.* ¶¶ 103, 105.

Throughout the remainder of the lunch break, Mr. Guglielmo and Mr. Cloutier engaged in discourse about the COVID-19 vaccine.  *Id.* ¶ 95.  At the end of the lunch break, the two teachers returned to another classroom to resume their co-taught reading class.  *Id.* ¶ 96.  As students assembled into the classroom, Mr. Cloutier purportedly continued expressing his thoughts on the COVID-19 vaccine and Dr.

---

[3] Dr. Fauci was the Director of the National Institute of Allergy and Infectious Disease at the National Institutes of Health from 1984 to 2022.

Fauci. *Id.* ¶ 97. During his diatribe, Mr. Cloutier allegedly made inflammatory comments, in which he stated that the COVID-19 vaccines "are designed to kill you," and Dr. Fauci was a "murderous butcher" who had "experimented on orphans." *Id.* ¶¶ 101-106. These comments are what prompted Mr. Guglielmo to remove his MLL students from the classroom and report Mr. Cloutier's conduct to the administration. ECF No. 38 ¶¶ 97-99, 119.

After her meeting with Mr. Guglielmo, AP Sweet notified Principal Hobin that Mr. Guglielmo came into her office in a "heightened state" regarding "a challenging day in [the] classroom," prompting Principal Hobin to hold his own meeting with Mr. Guglielmo. *Id.* ¶ 109. In this meeting, Mr. Guglielmo reported Mr. Cloutier's remarks about the COVID-19 vaccine, Dr. Fauci, and January 6th.[4] *Id.* ¶¶ 112-114, 116-118. Further, Mr. Guglielmo reported that Mr. Cloutier made politically charged statements about January 6th during lessons on the First and Sixth Amendments, including referring to those arrested at the event as "detainees." *Id.* ¶¶ 111, 114-15. Mr. Guglielmo expressed that Mr. Cloutier presenting his "false" comments about Dr. Fauci and the COVID-19 vaccine as facts to his students made him so concerned that he removed his MLL students from the co-teaching classroom to "protect them from continued exposure to Mr. Cloutier." *Id.* ¶¶ 118-19. Mr. Guglielmo indicated to AP Sweet and Principal Hobin, respectively, that he did not want to work with Mr. Cloutier any further. *Id.* ¶¶ 104, 118-19.

---

[4] Mr. Guglielmo reported in this meeting that Mr. Cloutier called Dr. Fauci a "criminal" and that he "should be put in jail" because the "vaccines were killing people." ECF No. 116.

After his meeting with Mr. Guglielmo, Principal Hobin gave his meeting notes—which were written on the back of Dean Herlihy's list of concerns he received earlier—to AP Sweet. *Id.* ¶ 122. He also designated APs Sweet and Cronin to take whatever steps they found appropriate to handle the matter. ECF No. 38 ¶ 120. AP Sweet promptly confirmed with Human Resources that Mr. Cloutier was an "at will" employee and could be terminated with or without cause. *Id.* APs Sweet and Cronin then called Mr. Cloutier into a meeting in Principal Michael Hobin's office to discuss concerns about his performance.[5] *Id.* ¶ 127. They raised Mr. Cloutier's management of "disruptive" students in his roles as a substitute teacher and detention monitor and highlighted his refusal to write a disciplinary referral to Student 2 for the "I Choose to Include" t-shirt incident. *Id.* ¶¶ 132-133. In response, Mr. Cloutier repeated the explanation he gave to Ms. Ezerins when asserting his reasons for not writing a disciplinary referral for Student 2. ECF No. 38 ¶ 133-34; ECF No. 42 ¶ 203.

Eventually, the meeting turned to Mr. Guglielmo's reports against Mr. Cloutier about Dr. Fauci, the COVID-19 vaccine, and January 6th. During that discussion, Mr. Cloutier confirmed that he told Mr. Guglielmo that he was in Washington D.C. on January 6th. ECF No. 38 ¶ 142. Further, he admitted to sending articles to Mr. Guglielmo during school time via his WPS email. *Id.* ¶ 144. That said, Mr. Cloutier denied making any derogatory comments about Dr. Fauci. *Id.* When confronted with Mr. Guglielmo's allegation that, in front of students, he said the COVID-19 vaccine was "designed to kill you," Mr. Cloutier purportedly leaned

---

[5] Principal Hobin was not present at this meeting.

toward AP Sweet and said, "are you out of your mind?"  *Id.* ¶ 145.[6]  AP Sweet perceived Mr. Cloutier's strong reaction to the question as "hitting a nerve"—leading her to infer that Mr. Cloutier *did* talk about the COVID-19 vaccine and Dr. Fauci in front of students, as reported.  *Id.* ¶ 147.  Ultimately, AP Cronin ended the meeting once the discussion reached impasse and announced that Mr. Cloutier "was no longer needed at WPS" before escorting Mr. Cloutier out the building.  ECF No. 38 ¶¶ 149-150.  Mr. Cloutier sue about a year later.

## II.   STANDARD OF REVIEW

A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A party can show a genuine dispute by citing to materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by showing that the materials cited either do not establish a genuine dispute or are not supported by admissible evidence.  *Id.* Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact"

---

[6] Cloutier admits asking AP Sweet if she was "out of her mind" but contends he said this in response to a different question.  ECF No. 42-1 ¶ 46.

because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial. *Id.* at 323.

## III.  DISCUSSION

### A.  First Amendment Retaliation

The First Amendment guarantees the right to speak on a matter of public concern and an individual does not forfeit such a right when choosing to work for the government. *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024) (citing *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)). But public employees' First Amendment rights "are not absolute." *Curran*, 509 F.3d at 44. Rather, government employers are afforded some room in controlling their employees' speech because: (1) without such control "there would be little chance for the efficient provision of public services," and (2) when public employees "speak out," they can "express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006). Thus, public employees "must accept certain limitations on his or her freedom." *Id.* at 418. That said, public employees "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419.

Thus, when a public employee asserts a claim that their employer retaliated against them for exercising their First Amendment rights, the Court must apply the three-part framework the Supreme Court outlined in *Garcetti v. Ceballos*—which balances the competing interests of the government employer and their employee.

*See id.* at 418. At part one, the Court must "determine[e] whether the employee spoke as a citizen on a matter of public concern." *Id.* At part two, the Court must decide "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* This inquiry requires "balanc[ing]… the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [Town], as an employer, in promoting the efficiency of the public services it performs through its employees." *Curran*, 509 F.3d at 44 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Lastly, at part three, the employee must establish that their protected speech "was a substantial or motivating factor in the adverse employment decision." *Id.* at 45. If the plaintiff satisfies their burden on all three parts, then the burden shifts to the employer to prove, "by a preponderance of the evidence that it would have reached the same decision regarding the adverse employment event even in the absence of the protected conduct." *MacRae*, 106 F.4th at 133 (quoting *Stuart v. City of Framingham*, 989 F.3d 29, 35 (1st Cir. 2021)) (internal quotations omitted).

1.    "I Choose *Not* to Include" Incident

Mr. Cloutier contends that he had a First Amendment right to decline to issue a disciplinary referral for Student 2 based on the "I Choose to Include" t-shirt-ripping incident because he was acting to "protect the freedom of speech of his student." ECF No. 1 ¶ 50. He asserts that the Defendants, by urging him to write the referral, attempted to require him to support their "compelled speech," i.e., requiring WHS students to wear the "I Choose to Include" t-shirts—which was contrary to his belief

that the "government should not compel students to express political positions." *Id.* ¶ 54. Accordingly, Mr. Cloutier asserts that the Defendants deprived him of his First Amendment rights to freedom of speech, expression, and association when they terminated him for refusing to help the Defendants "violate Student 2's rights by making a disciplinary referral for the Student." *Id.*; ECF No. 41 at 27.

Under the applicable three-part test, the important inquiry is whether Mr. Cloutier spoke as a *citizen* on a matter of public concern. *Garcetti*, 547 U.S. at 418. The dispositive factor in this inquiry is whether the speech underlying Mr. Cloutier's claim was made "pursuant to [his] official duties." *Id.* at 421. If the answer is yes, then Mr. Cloutier cannot successfully assert a First Amendment claim, because "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties." *Id.* at 421-22.

Here, the "speech" or "expression" underlying Mr. Cloutier's claim as to the "I Choose Not to Include" incident was made pursuant to his official duties as a WHS substitute teacher. There is no dispute that, in his role as a WHS substitute teacher, Mr. Cloutier was responsible for "maintain[ing] effective classroom management strategies," "report[ing] all student . . . discipline problems to the appropriate authority," and following WPS' "regulations and policies." ECF No. 42-3. Nor is there any dispute that effective classroom management included issuing disciplinary referrals to students who acted contrary to WPS policies and regulations. ECF No. 38 ¶ 49. Mr. Cloutier's alleged protected speech consisted of times when he expressed reluctance to initiate student disciplinary action that he deemed illegal. His "speech"

11

focused only on events at his workplace and was directly related to his responsibilities as a WHS substitute teacher tasked with maintaining effective classroom management strategies and reporting disciplinary issues. Thus, Mr. Cloutier's communications to WHS personnel and administration about the propriety of disciplining a student is the type of speech that owes its existence to his professional responsibilities as a public employee, not an unaffiliated citizen, and therefore is not protected under the First Amendment. *Garcetti,* 547 U.S. at 421-22. Accordingly, the Court GRANTS the Defendants' Motion for Summary Judgment on Mr. Cloutier's First Amendment retaliation claim arising from the "I Choose Not to Include" incident.

### 2.    Mr. Cloutier Communications to Mr. Guglielmo.

The other basis for Mr. Cloutier's First Amendment claims surrounds the remarks that he made about the COVID-19 vaccine, Dr. Fauci, and January 6th to Mr. Guglielmo on the day that he was terminated.

#### a.  Private Citizen Speaking on a Matter of Public Concern

To start, Mr. Cloutier asserts that he acted as a private citizen, when, before school or during lunch break, he made remarks to Mr. Guglielmo about topics of public concern: the COVID-19 vaccine, Dr. Fauci, and January 6th. ECF No. 1 ¶ 49; ECF No. 41 at 27. But the Defendants assert that based on Mr. Guglielmo's credited report, they understood that Mr. Cloutier "made inflammatory and politically charged comments regarding Dr. Fauci, the COVID-19 vaccine, and the January 6th rally at school, in front of students." ECF No. 37 at 30. They contend that because

the students' attendance in class was compulsory, the students were likely to perceive Mr. Cloutier as speaking on behalf of students. *Id.*

In determining whether Mr. Cloutier spoke as a private citizen on a matter of public concern, the Court "must defer to the employer's view of the underlying historical facts so long as that view is facially reasonable and drawn in good faith." *Meaney v. Dever*, 326 F.3d 283, 288 (1st Cir. 2003) (citing *Waters v. Churchill*, 511 U.S. 661, 677 (1994)). Here, the Defendants were entitled to believe and rely upon the version of facts they developed after conducting what the Court deems to be a reasonable investigation of Mr. Cloutier's behavior. When AP Sweet received the report from Mr. Guglielmo, who directly witnessed Mr. Cloutier's behavior, she did not doubt its contents due to Mr. Guglielmo's reputation for credibility and protectiveness of his students. ECF No. 38 ¶ 155. Mr. Guglielmo's report was then substantiated or bolstered by: (1) the Defendants' review of other reports about Mr. Cloutier's lack of conformity with WPS' expectations for appropriate teacher conduct; (2) Mr. Cloutier's admission that he used his WPS email to send article links about Dr. Fauci to Mr. Guglielmo and told Mr. Guglielmo that he was in Washington D.C. on January 6; and (3) Mr. Cloutier's reactions when the Defendants questioned him about making inflammatory statements in front of students.

Thus, while Mr. Cloutier might disagree, the Court finds the Defendants' belief that Mr. Cloutier made controversial comments during class time in front of students to be reasonable. *See Hennessy v. City of Melrose*, 194 F.3d 237, 247 (1st Cir. 1999) (noting that it was "prudent and constitutionally appropriate" for a

principal to credit a report against the plaintiff from an experienced teacher with no "axe to grind," especially when the report arose after additional problems involving the plaintiff surfaced); *see also Waters*, 511 U.S. at 680 (noting that a reasonable manager could have concluded no further investigation was needed regarding report against employee when report came from two trusted employees with substantiated reliability and manager had "the benefit of a face-to-face meeting with the employee he fired."). Accordingly, the Court will defer to the Defendants' view of what Mr. Cloutier said when determining whether he made his statements as a private citizen on a matter of public concern.

With that hurdle cleared, the record—when viewed in a light favorable to Mr. Cloutier—establishes that he was speaking as a private citizen when making his remarks about Dr. Fauci and COVID-19 in front of students. The Court must take a "hard look at the context of the speech" to determine whether such speech was made pursuant to official responsibilities. *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011). True, the fact that Mr. Cloutier made his speech during instructional time makes it less likely that his speech is citizen speech. *Id.* at 33 n.12 ("[T]he more intertwined the speech is with the employee's work station the less likely it is that the speech is protected as citizen speech."). But looking at the context in which Mr. Cloutier made his speech, it appears that he was continuing his lunch time discourse about the COVID-19 vaccine and Dr. Fauci into the instructional period. And neither party disputes that these statements were directed to Mr. Guglielmo, not the cohort of students that entered the classroom. ECF No. 38 ¶ 97. Thus, while Mr. Cloutier

may have improperly used instructional time to continue to speak on these matters, nothing suggests that when speaking as such, he was doing so in pursuit of his duties as a substitute teacher.[7]

Now that the Court has established that Mr. Cloutier made his challenged speech as a private citizen, it must now decide whether such speech was on a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (internal quotations omitted). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Snyder*, 562 U.S. at 453 (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

Here, putting aside, its "inappropriate or controversial character," Mr. Cloutier's statements about COVID-19 pandemic (including those about Dr. Fauci and the efficacy of vaccines) touches on matters of public concern. At the time Mr. Cloutier made these statements, the efficacy of the COVID-19 vaccine was certainly a subject of general interest and of value and concern to the public. *Franks*, 573 U.S.

---

[7] If Mr. Cloutier began teaching and *then* deviated from the curriculum to make his comments about the COVID-19 and Dr. Fauci, there would be a stronger argument that he made that speech pursuant to his official duties as a teacher.

at 241. Even WPS recognized the robust debate about the efficacy of the vaccine around this time. A month after Mr. Cloutier's termination, WPS emailed WPS parents and teachers about pandemic protocols, stating that "[m]embers of the community can and will continue to debate the efficacy of vaccines . . .." ECF No. 42-8. Mr. Cloutier's controversial statements about Dr. Fauci and the vaccine, at its core, express a viewpoint against the safety of the COVID-19 vaccines—which is a topic of public concern. *See Webb v. Aspen View Acad.*, No. 22-CV-01391-STV, 2024 WL 3069276, at *15 (D. Colo. June 20, 2024) (finding teacher's communications about the efficacy of the COVID-19 vaccine a topic of public concern); *Malone v. WP Co., LLC*, No. 3:22-CV-00046, 2023 WL 6447311, at *5 (W.D. Va. Sept. 29, 2023) (finding statements about the "COVID-19 pandemic and whether government-approved vaccines are effective" were matters of public concern).

Further, no one disputes that Mr. Cloutier's statements about what he observed in Washington D.C. on January 6th touches on a matter of public concern. The January 6th attacks on the United States Capitol were related to the outcome of the 2020 Presidential election and remains an infamous political event of national significance. Thus, Mr. Cloutier's "inappropriate or controversial" statements about his account of January 6th certainly relates to a subject of general interest and of value and concern to the public. *Franks*, 573 U.S. at 241.

b.  **Balancing the Interests**

Moving to the second step of the analysis, the Court must balance the interests of Mr. Cloutier and his former employer.[8]  This balancing inquiry—while a matter of law the Court must decide—is a fact intensive inquiry.  *MacRae*, 106 F.4th at 136 (citations omitted).  The relevant analysis "requires a balancing of the value of an employee's speech against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission."  *Id.* (quoting *Davignon v. Hodgson*, 524 F.3d 91, 103 (1st Cir. 2008)).  "[T]he stronger the First Amendment interests in the [employee's] speech, the stronger the justification the employer must have."  *Curran*, 509 F.3d at 48 (citing *Connick*, 461 U.S. at 150).  When evaluating the government's interest, the Court may consider: "(1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision."  *Davignon*, 524 F.3d at 104 (citations omitted).  The Court may also consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's

---

[8] The Court applies the balancing analysis to the facts as the Defendants believed them to be because, as concluded above, the Defendants arrived at their conclusion as to content and timing of Mr. Cloutier speech "reasonably and in good faith."  *Davignon v. Hodgson*, 524 F.3d 91, 103 (1st Cir. 2008) (citing *Waters v. Churchill*, 511 U.S. 661, 677 (1994)).

duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388 (citing *Pickering*, 391 U.S., at 570–573).

Here, viewing the facts in a light most favorable to Mr. Cloutier, his statements to Mr. Guglielmo did touch upon hot-button political and public issues such as the efficacy of the COVID-19 vaccine and nature of the incidents that occurred in Washington D.C. on January 6th. Mr. Cloutier's First Amendment interest in talking about such topics would normally weigh in his favor in this balancing test because "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Connick*, 461 U.S. at 145 (citation and internal quotation marks omitted). That said, Mr. Cloutier's First Amendment interest weighs less than it normally would because some of his comments on such hot-button political and public issues were made in a "insulting," "derogatory, and disparaging manner." *See MacRae*, 106 F.4th at 137 (affording less weight to teacher's First Amendment interest because some of her social media posts commented up "hot-button political issues in a mocking, derogatory, and disparaging manner."); *see also Curran,* 509 F.3d at 49 ("Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balance."). Particularly, "murderous butcher" and "criminal" are undeniably insulting and derogatory descriptors—which Mr. Cloutier used to disparage Dr. Fauci. Thus, while the First Amendment interest in Mr. Cloutier's speech still weighs in his favor, the First Amendment does not accord the highest value to the insulting, derogatory, and disparaging aspects of his speech.

On the other side of the balancing test is the Defendants' interest in preventing unnecessary disruption and inefficiencies in the learning environment at WPS. Mr. Cloutier asserts that it was not his communications with Mr. Guglielmo that was disruptive; he contends that it was Mr. Guglielmo and APs Sweet and Cronin's "overreactions" to such communications that was disruptive. ECF No. 41 at 32. But even if Mr. Guglielmo's response to Mr. Cloutier's speech was an "overreaction," the Defendants were "entitled, within reasonable limits, to take [Mr. Guglielmo's] report at face value and give weight to [his] subjective reaction." *Hennessy*, 194 F.3d at 247 (citing *Waters*, 511 U.S. at 676). And Mr. Guglielmo's reaction to Mr. Cloutier's speech is relevant to the Defendants' interest because the "[i]nteraction between . . . teachers in neighboring classrooms, especially those who share instructional responsibilities, is an important consideration for school administrators." *Id.* "In such circumstances, the First Amendment does not require a public employer to stand idly by when one employee's expression engenders" disconcert in a co-worker. *Id.* (citing *Waters*, 511 U.S. at 676).

Here, Mr. Cloutier's statements to Mr. Guglielmo impaired the "harmony" between the two teachers and had a detrimental impact on the close working relationship that they had to maintain as co-teachers of the reading class. When Mr. Guglielmo reported Mr. Cloutier's statements to AP Sweet, he was "outraged" and "pretty incandescent" and AP Sweet noticed that he was "heightened" and speaking quickly and animatedly. ECF No. 38 ¶ 100. And Mr. Guglielmo also indicated that that he "had it" with Mr. Cloutier and no longer wanted to teach the reading class

with him. *Id.* ¶ 104. Given Mr. Cloutier and Mr. Guglielmo shared instructional responsibilities, the Defendants were not required to simply sit idly when faced with Mr. Guglielmo's disconcert with a substitute teacher's conduct. *Hennessy*, 194 F.3d at 247. Rather, while Mr. Cloutier's communications to Mr. Guglielmo touches on matters of public concerns, his interest in making such communications at the time and in the inflammatory manner he chose, does not outweigh the Defendants strong interest "in guarding against the impairment of relations among teachers." *Id.*

Additionally, the Defendants' considerable interest in implementing the curriculum without undue interference easily outweighs Mr. Cloutier's interest in expressing himself at the time and in the manner her chose. The Defendants understood, per Mr. Guglielmo's credited report, that Mr. Cloutier's commentary about the COVID-19 vaccine and Dr. Fauci continued for minutes after the instructional period began and students reassembled into the classroom. ECF No. 38 ¶ 98. Mr. Cloutier's assigned duties in following the lesson plan left for him were impeded because he used instructional time to make derogatory comments about the COVID-19 vaccine and Dr. Fauci to Mr. Guglielmo, rather than teaching the students present in the classroom. And when, as here, a "teacher elects a mode of communication—audible denigration and visible petulance in the learning environment, in front of students and others—that plainly conflicts with the school's legitimate interest in requiring full participation in the designated curriculum, the constitutional balance tips sharply in the employer's favor." *Hennessy*, 194 F.3d at 248.

20

Accordingly, the Court finds that the balancing test weighs strongly in the Defendants' favor, thus entitling them to summary judgment. Based on this conclusion, the Court need not determine whether the Defendants are entitled to qualified immunity.

IV.    CONCLUSION

Based on the above, the Court GRANTS the Defendants' Motion for Summary Judgment, ECF No. 37.

IT IS SO ORDERED,

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

June 12, 2025